**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED GALVANIZING, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-0551 |
| | § | |
| IMPERIAL ZINC CORP., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION ENTERING FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

This is a contract dispute governed by the Uniform Commercial Code.  United Galvanizing,

Inc., a Houston galvanizer, seeks damages against Richker Metals, Inc., a California metals broker.

The dispute arises out of an order United Galvanizing placed for Richker Metals to supply

approximately 45,000 pounds of zinc in June 2007.  Richker Metals arranged for the zinc to be

supplied by Imperial Zinc Corp., an Illinois company.  United Galvanizing used half of the zinc

when it arrived.  The zinc contained too much aluminum for the galvanizing process.  United

Galvanizing had to interrupt its work and take extensive steps to restore the proper chemical balance

to its galvanizing kettle.  The remaining zinc was returned to Richker Metals.  United Galvanizing

did not pay for any of the zinc.

In this lawsuit, United Galvanizing contends that the zinc was not what it ordered and that

Richker Metals must pay for the damages resulting from adding the zinc to the galvanizing kettle.

Richker Metals denies any liability, asserting that it supplied what was ordered and that United

Galvanizing accepted the zinc despite clear indications from the bill of lading and the appearance

of the zinc that it was not what United Galvanizing asserts it ordered.  Richker Metals seeks payment

from United Galvanizing for the zinc that was used.  Both sides seek attorneys' fees.

This court held a two-day bench trial on November 29 and 30, 2010.  The parties presented fact and expert testimony, documents related to the transactions, and evidence of industry standards and practice.  Based on the testimony and exhibits, the parties' oral and written legal arguments, and the relevant law, this court finds and concludes as follows:

- United Galvanizing must pay for the zinc that it received from Richker Metals and used, and the failure to do so is a breach of contract.

- Richker Metals has no liability to United Galvanizing for the damages allegedly incurred as a result of the chemical composition of the zinc placed in the United Galvanizing kettle.

The detailed reasons for these rulings are set out in the findings of fact and conclusions of law set out below.  The amount of attorneys' fees Richker Metals is entitled to recover remains outstanding.  A telephone conference is set for **January 13, 2011, at 4:00 p.m.**  to set a schedule for resolving this issue.  Instructions for the telephone conference will be e-mailed to all counsel.[1]

## I.     Procedural Background

The events at issue occurred in June and July 2007.  In early October 2007, United Galvanizing sent Richker Metals a letter demanding payment for the costs and consequential damages caused by the allegedly nonconforming zinc.  (Docket Entry No. 11, Ex. B).  The letter demanded payment for the price of testing and replacing the zinc in the galvanizing kettle and for $410,032 in lost profits. The total demanded was $479,718.90.  (*Id.*).

On October 19, 2007, Richker Metals sued United Galvanizing in California state court,

---

[1]  To the extent any of the conclusions of law is a finding of fact, it should be considered as a finding of fact.  To the extent any of the findings of fact is a conclusion of law, it should also be considered as a conclusion of law.

seeking the unpaid invoiced amount for the zinc that United Galvanizing had used.  The California court granted United Galvanizing's motion to dismiss for lack of personal jurisdiction.

United Galvanizing filed this suit on February 19, 2008, asserting breach of contract and violations of the Texas Deceptive Trade Practices Act (TDTPA), TEX. BUS. & COM. CODE § 17.41, *et seq.*, and seeking actual and consequential damages and attorneys' fees. (Docket Entry No. 1). On April 21, 2008, Imperial Zinc moved to dismiss this case for lack of personal jurisdiction and for failure to state a claim.  (Docket Entry No. 6)  On April 23, 2008, United Galvanizing filed its first amended complaint to "clarify and add additional causes of action under F.R.C.P. 15(a)." (Docket Entry No. 11).  The amended complaint asserted claims for breach of contract, attorneys' fees, negligence, negligent misrepresentation, deceptive trade practices, and breach of implied warranty of merchantability against Richker Metals and breach of warranty of merchantability against Imperial Zinc.  (*Id.*).  Richker filed an answer to the first amended complaint and a counterclaim against United Galvanizing on May 13, 2008.  (Docket Entry No. 17).

Imperial Zinc filed its second motion to dismiss for lack of personal jurisdiction on May 8, 2008, arguing that it lacked the necessary contacts with Texas.  (Docket Entry No. 13).  This court granted the motion to dismiss.  (Docket Entry No. 31).  United Galvanizing then sued Imperial Zinc in the federal district court in the Northern District of Illinois; that suit is pending.

Richker Metals moved for summary judgment, seeking to limit United Galvanizing's damages.  (Docket Entry No. 48).  This court granted summary judgment as to United Galvanizing's claim for consequential damages, holding that the summary judgment evidence did not raise a fact issue material to determining whether the alleged nonconforming quality of the zinc United Galvanizing obtained from Richker Metals caused United Galvanizing to suffer any consequential

damages or, if so, in what amount.  This court also held that United Galvanizing could not seek damages for lost profits.  Richker Metals's motion for summary judgment was denied as to "cover" damages and incidental damages such as for testing, new preflux, acid disposal, and new acid. (Docket Entry No. 59).

## II.     The Evidence at the Bench Trial

At the bench trial, United Galvanizing called as fact witnesses its purchasing manager, Kerry Henrichsen, who placed the order at issue; its operations manager, Raymond Lynch; and, adversely, the president of Richker Metals, Russ Richker, and its Houston-based vice president for sales, Albert Vasquez.  As its expert witness, United Galvanizing called John F. Malone of Galvanizing Consultants, Inc., who has worked for various galvanizing companies through his decades-long career in the galvanizing industry.  As expert witnesses, Richker Metals called David Ware, the president and chief executive officer of Tennessee Galvanizing, and Dr. Thomas J. Langill, who is the Technical Director of the American Galvanizers Association, a nonprofit trade association that provides technical support on hot-dip galvanizing for corrosion control and makes classes available to those in the industry.

Of the expert witnesses, Dr. Langill was the most credible source of reliable information about the American Society of Testing Materials (ASTM) standards that apply to hot-dip galvanizing and the problems that affected the transaction at issue.  David Ware also offered helpful information about the practical applications of the ASTM standards in the galvanizing business. United Galvanizing's expert, John Malone, had extensive practical experience but was imprecise and inaccurate in describing the specifications and qualities of zinc that are appropriate for used in galvanizing.  His testimony exemplified the type of confusion that contributed to the dispute in this

case.

### A.    The Evidence and Findings on the Standards for Zinc Used in Galvanizing

Hot-dip galvanizing is the process of immersing fabricated or structural steel in a kettle or vat of molten zinc, resulting in a metallurgically bonded alloy coating that protects the steel from corrosion.  Zinc is broadly classified as "primary" or "secondary."  Primary zinc is supplied from the mine and has not been previously used.  Secondary zinc is recycled and is generally less expensive than primary zinc.  Because secondary zinc can be manufactured using different processes and composed of different source materials, it can contain amounts of metals, such as aluminum, that can adversely affect the galvanizing process.  The ASTM standards in place for galvanizing and for the zinc used in galvanizing address these concerns.

In 2007, the ASTM standard specification for zinc was designated B 6.  ASTM A 123 is the specification for Zinc (Hot-Dip Galvanized) Coatings on Iron and Steel Products.  In 2007, ASTM A 123 stated that to be acceptable for galvanizing baths, the zinc used had to comply with ASTM B 6.  This standard specifically excluded zinc produced by "sweating" or remelting of secondary zinc.  "Remelting" is the process of refining secondary zinc by combing source material — such as scrap and dross or byproducts of galvanizing — and heating them to the point that melts the zinc but not other metals that may be included in the mix.  All "remelt" is secondary zinc, but secondary zinc can also be made through different processes than remelting, such as acid baths.  Remelt and sweated forms of secondary zinc carry a high risk of inconsistency in the chemical composition and of unacceptable levels of impurities, such as aluminum.  Other processes, such as acid baths, generally create purer alloys.

Under the 2007 ASTM B 6, no remelt or sweated forms of secondary zinc could be used in

galvanizing baths.  Other forms of secondary zinc, however, could be used for galvanizing if they met the requirements for one of the grades specified in the B 6 standard.

ASTM B 6 includes a table that specifies the chemical composition requirements for five grades of zinc:  LME Grade; Special High Grade; High Grade; Intermediate Grade; and Prime Western Grade.  The most common in the American market are Prime Western, High Grade, and Special High Grade.  Prime Western, the lowest grade that is acceptable for use in galvanizing baths, must have an aluminum content of less than .01 percent and a lead content below 1.4 percent.  High Grade has the same aluminum content limit but a lower lead limit: .03 percent.  Special High Grade shares the High Grade lead limit, but it can contain no more than .003 percent aluminum.  (Pl.'s Ex. 11; Def.'s Ex. 21).  ASTM B 6 states that the zinc metal "shall conform to the requirements" prescribed in the table.  The standard also states that orders for zinc metal under this specification "shall" include the ASTM designation and year of issue, the quantity, the name of the material, the size, and the grade.

In 2009, ASTM A 123 was changed to add a reference to ASTM B 960 zinc as acceptable for galvanizing baths, along with zinc complying with ASTM  B 6.  ASTM B 960 is a zinc specification that, unlike B 6, recognizes remelt zinc as complying with ASTM 123, but only if it meets the Prime Western composition standards set in B 6.  It is well recognized that remelt zinc may present problems in the consistency of the composition throughout a load, which means that the concentrations of aluminum and lead may be higher in parts of the load than others.  This can in turn cause problems in the kettle if the parts of the load with the higher concentrations are used first.

In sum, under the ASTM B 6 standard in place in 2007 when United Galvanizing placed its

order with Richker Metals, it was acceptable to use secondary zinc that met the B 6 categories in galvanizing baths, but it was *not* acceptable to use remelt zinc.  There was no industry-recognized category as "Prime Western remelt."  Under the B 960 standard that issued in 2009, it is acceptable to use remelt zinc for galvanizing, but only if it meets Prime Western grade.  Neither B 960 nor B 6 recognizes any remelt zinc category higher than Prime Western grade.  There was, and is, no industry-recognized category of "High Grade remelt" zinc.

United Galvanizing argues that the ATSM standards do not "govern."  But these standards are recognized in the industry as describing zinc with a chemical composition that meets certain limits and has a certain quality.  United Galvanizing's own witnesses used the terms set by these ASTM standards to describe what representations were made about the chemical composition and quality of the zinc at issue before it was purchased and what United Galvanizing intended to purchase.  This court finds that even if compliance with the ASTM standards is a "guideline" and not legally required of galvanizers, both the United Galvanizing and Richker Metals used the standards in their communications and testimony because they have a recognized meaning and are commonly used in the industry.  Under the UCC, the ASTM standards are part of the "usage of trade" that can be used to analyze the terms of an agreement between merchants.  *See* TEX. BUS. & COM. CODE § 1.201(b)(3) (defining an agreement as "the bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of performance, course of dealing, or usage of trade"); *id.* § 1.303(d)  ("[U]sage of trade in the vocation or trade in which they are engaged or of which they are or should be aware is relevant in ascertaining the meaning of the parties' agreement.").

**B.    The  Evidence and Findings on What United Galvanizing Ordered and What Richker Metal Delivered**

7

In the summer of 2007, United Galvanizing, based in Houston, Texas, faced a serious supply problem.   United Galvanizing depends on a steady supply of zinc to perform its galvanizing processes. Kerry Henrichsen, United Galvanizing's purchasing manager,  testified that in June 2007, there was a world-wide shortage of zinc.  United Galvanizing's primary supplier was U.S. Zinc; United Galvanizing had a requirements contract with this company, from which it purchased Prime Western, High Grade, or Special High Grade zinc.  Henrichsen testified that he understood that a reference to these categories calls for primary zinc.

In June 2007, however, Henrichsen was unable to obtain zinc from U.S. Zinc.  He raised this problem at a lunch meeting with Albert Vasquez, the Houston-based vice-president for sales for Richker Metals.  Vasquez and Henrichsen had first met eighteen years earlier when Vasquez was at U.S. Zinc.  At Richker Metals, Vasquez regularly purchased scrap metal from United Galvanizing. At the lunch meeting, which Vasquez set up as part of cultivating United Galvanizing as a scrap-metal supplier, the men discussed the zinc shortage.  Henrichsen testified that Vasquez said that he could obtain remelt zinc for United Galvanizing.  According to Henrichsen, in response to his questions, Vasquez stated that the remelt zinc was "Prime Western or better."  Vasquez testified that he did not tell Henrichsen that the remelt zinc he could provide met or exceeded Prime Western. Instead, he told Henrichsen during the lunch that the zinc had an overall or average aluminum concentration of .02 to .03 percent.  This is a higher aluminum concentration than could have qualified for categorization as Prime Western or better.  Vasquez testified that he described the zinc that he could obtain as "remelt off-spec."

Both Henrichsen and Vasquez were discussing matters that were beyond their usual experience.  Henrichsen had never before ordered remelt zinc for use in the galvanizing kettle.  He

8

understood that remelt zinc was more prone to inconsistency within a load than primary zinc and that problems can result.  Vasquez's experience at U.S. Zinc was limited to selling primary zinc.  He was not familiar with a galvanizer's requirements for zinc.  This was the first, and only, time Vasquez had sold remelt zinc to any customer.  Vasquez's purpose was to try to do a favor for a customer who had a supply problem.  Although Richker Metals expected to make a profit, it was a very small amount and was not the primary reason for the transaction.

This court finds that Vasquez's account of the conversation with Henrichsen is the more credible.  Vasquez and Henrichsen both testified that they discussed remelt zinc.  Because remelt zinc was excluded from ASTM B 6, it could not be described as meeting or exceeding any of the recognized specifications under that standard.  The fact that the two men were talking about remelt zinc made it unlikely that Vasquez  would have used the term "Prime Western or better" to describe compliance with a B 6 standard, given that the standard did not apply to remelt zinc. Vasquez told Henrichsen that the remelt zinc he could obtain had aluminum concentrations of .02 to .03 percent, which was more than the Prime Western specification permitted.

Vasquez's testimony is also consistent with Richker's testimony that he and Vasquez had discussed the availability of remelt zinc with these aluminum concentrations.  This is further evidence that Vasquez did not describe the zinc he could obtain as meeting Prime Western quality.  Although Henrichsen did not receive the chemical analysis from Richker Metals until after he had ordered and used the remelt zinc, it was consistent with the .02 to .03 percent aluminum range Vasquez described during the lunch.  This court finds Vasquez's testimony credible.

Henrichsen testified that he would have used the zinc with the aluminum levels Vasquez described had they been consistent throughout the load.  Henrichsen's testimony that he would have

used the zinc with the chemical composition Vasquez described makes it even more likely that Henrichsen decided to purchase the zinc even though it was not represented as meeting the Prime Western composition standard.

As discussed more fully below, none of Henrichsen's e-mails to Vasquez used the term "Prime Western," an omission that further reinforces the conclusion that the zinc was not described as meeting that standard. Henrichsen's first use of the term was in a later e-mail to Lynch explaining his order after the zinc he ordered had created significant problems. The context makes Henrichsen's statement in the e-mail less credible.

In sum, this court finds that Vasquez did not represent the zinc he could obtain to help United Galvanizing address its supply problem as meeting or exceeding Prime Western. Instead, Vasquez represented the zinc as remelt that had an average aluminum concentration of .02 to .03 percent.

On June 25, 2007, Henrichsen sent Vasquez an e-mail stating as follows:

Albert,

> Good afternoon. Could you please ship United a load of the zinc metal we discussed at lunch the other day. I would like to give a load a try? Please advise earliest delivery date.
>                     Thanks,

(Docket Entry No. 11, Ex. A). This is the only writing in the record from United Galvanizing for the order. Henrichsen testified that the usual way to order zinc is through a contract that specifies the grade of the zinc ordered. The e-mail Henrichsen sent failed to comply with the ASTM B 6 standard for entering a contract to purchase zinc for galvanizing because it contained no reference to the ASTM designation and year of issue, the quantity, the name of the material, the size, and the grade.

The record contains an order confirmation from Richker Metals to United Galvanizing dated

June 25, 2007, confirming an order of 45,000 pounds of "remelt zinc,"with no reference to any grade. Def.'s Ex. 2. United Galvanizing denied it received this confirmation but does not dispute that the zinc it purchased was "remelt."

Vasquez responded to Henrichsen's e-mail by sending an e-mail stating that his supplier was gone for the day, but that he would "call am tomorrow and get a ship date for [Henrichsen]." Henrichsen understood that Richker Metals was a broker and would be ordering the zinc from a supplier. On June 26, 2007, Richker Metals contracted with Imperial Zinc to purchase one truck load — 44,761 pounds — of remelt zinc sows at $1.4860/pound. (Docket Entry No. 14, Ex. A-2). Richker Metals charged United Galvanizing $1.5759/pound, which was the London Metals Exchange price plus $.08/pound. The prevailing spot price for prime zinc was then the London Metals Exchange rate plus $.13 to .15/pound.

On June 27, 2007, Imperial Zinc produced the remelt zinc for Richker Metals in Illinois and issued an invoice on the same date. Richker Metals had the goods shipped by a carrier of its choosing to California and then shipped the zinc United Galvanizing, where it arrived on June 29, 2007. The Bill of Lading described the zinc as "Remelt High Grade Zinc Sows," a term that in 2007 did not exist under B 6 (and still does not exist under B 960). "Remelt High Grade" does not refer to a recognized chemical composition under B 6 or B 960. David Ware, one of the expert witnesses, stated that the phrase could mean remelt composed from source materials that included high grade primary zinc. Even if this is reasonable, the word "remelt" and the absence of any detailed chemical analysis or certification of compliance with B 6 clearly raised the risk of inconsistent concentrations throughout the load. Henrichsen testified that he knew that remelt zinc was more prone to inconsistency in composition than primary zinc.

When the zinc arrived at United Galvanizing, the sows, or slabs, were spray painted with a number. The evidence showed that this is not typical of zinc that meets ASTM B 6. The zinc did not have an imprint that certified compliance with ASTM B 6. This product marking further indicated noncompliance with the B 6 standard.

With the Bill of Lading description of a category not recognized by the industry — "Remelt High Grade"— and the nonconforming appearance of the sows, questions should have been raised by United Galvanizing about the composition and quality of the zinc it received. But no one at United Galvanizing at work on the date the zinc arrived had been left any special instructions. Henrichsen did not recall if he told those working on the date in question that a load was arriving that deviated from the routine.

United Galvanizing does not ordinarily test zinc when it arrives, and it did not test the shipment from Imperial Zinc. But no one at United Galvanizing took any steps, including telephoning someone at either Richker Metals or Imperial Zinc, to verify the contents of the load before placing half of it in the galvanizing kettle.

ASTM standard B 6 states that the "manufacturer shall use care to have each lot of zinc metal of as uniform quality as possible." But this standard by its terms did not apply to remelt zinc in 2007. Standard A-123 stated that the responsibility for what goes into the galvanizing bath is on the galvanizer. United Galvanizing failed to meet that responsibility.

After adding half of the zinc shipment — 22,000 pounds — to the kettle, the utility poles United Galvanizing placed in it emerged with black spots, a sign of too much aluminum in the bath. Testing showed the kettle's aluminum concentration at more than four times the normal level after adding the load of zinc ordered from Richker Metals. United Galvanizing stopped its processing

and had testing done on the zinc in the kettle.  The tests showed unacceptably high levels of zinc.  Instead of the proper amount, below .001 percent, the tests showed .046 percent on July 5 and .025 percent on July 10.  (Pl.'s Ex. 10.)

United Galvanizing did not know what to do to restore the proper composition to the kettle.  Lynch testified that they tried adding potatoes and lumber to the mix.  United Galvanizing's expert described these techniques as "old wives' tales."

The witnesses agree that the shipment of zinc from Richker Metals was responsible for the increased aluminum level.  United Galvanizing ordered and placed 45,000 pounds of primary high grade zinc in the kettle to dilute the aluminum.  Two to three weeks later, the proper levels were restored.  United Galvanizing operated at reduced capacity for three weeks, though it never shut down completely.

The parties agree that Vasquez said that he would send an analysis of the composition of the zinc to Henrichsen.  Vasquez testified that he assumed that Henrichsen had received the analysis from someone else at the Richker Metals corporate office when Henrichsen placed the order before Vasquez had sent the analysis.  Only after using the zinc did Henrichsen contact Russ Richker, the president of Richker Metals, and obtain the chemical analysis.  The chemical analysis that Richker Metals received from Imperial Zinc and sent to United Galvanizing in early July showed that of four lots in the 45,000 pound load of the load, two had "NIL" aluminum, one had .02 percent, and one had .03 percent.  (Pl.'s Ex. 6.)  Henrichsen testified that the  numbers were averages for each lot and testified that he would have used the zinc with this concentration had it been consistent.  He believed that the bundles within each lot had inconsistent concentrations.  Such inconsistency is a risk of using remelt zinc, a risk that Henrichsen knew before he placed the order.  On the other

13

hand, Raymond Lynch, United Galvanizing's operations manager, testified that the .02 to .03 percent aluminum levels would have "thrown up a red flag" for him.

As noted, the fact that Henrichsen's subsequent e-mails to Richker Metals about the zinc omit any reference to a grade is further support for the finding that Vasquez did not offer, and Henrichsen did not order, remelt that met or exceeded Prime Western. Henrichsen's June 30 e-mail to Vasquez about United Galvanizing's problems with the zinc reads in part:

> We are having **major problems** with the remelt zinc received from Chicago on Friday. . . . .The problems did not start until after the addition of the remelt zinc. We have had to go and pick up a load of High Grade Zinc today, Saturday, June 30th, in order to try and dilute whatever it is that was in the load of remelt.

Pl.'s Ex. 3 (emphasis in original). Notably, the e-mail does not mention that the remelt was supposed to have been Prime Western or better. Similarly, in a July 13 e-mail to Vasquez, Henrichsen refers to "the load of remelt zinc that they have in the plant that appears to be high in aluminum content." (*Id.*) Again, there is no reference to a deviation from Prime Western or better zinc.

The first reference by Henrichsen in an e-mail to Prime Western grade is in an August 17 e-mail to his operations manager, Lynch, explaining what had happened with the zinc:

> My purchase order to Richker Metals was an e-mail order placed with Albert Vasquez on June 25th. I was aware that the material was remelt zinc when I placed the order. We had discussed the zinc over lunch earlier in the week. Albert assured me that all lab test[s] indicated that the material met normal Prime Western Standards. US Zinc was waiting on a large shipment of zinc from overseas that was running behind. We were running short of zinc for the week so I decided to purchase the remelt load to get some zinc in until US Zinc was able to resume the normal shipments.

*Id.* This e-mail acknowledges that Vasquez had discussed the lab tests, but the only lab tests in the

14

evidence show that the zinc did not meet the Prime Western standard.   This e-mail suffers from the same credibility problems as Henrichsen's testimony that Vasquez told him that the zinc met or exceeded Prime Western in its chemical composition.

On June 30, United Galvanizing informed Richker Metals that it was rejecting the zinc. Richker Metals arranged to pick up the remaining half-load on July 19.  United Galvanizing alleges that after it rejected the zinc, Richker Metals agreed that no payment was due.  Richker Metals denies this allegation and asserts that it repeatedly requested payment for the half-load that United Galvanizing used.  Richker Metals did not seek payment for the half-load that United Galvanizing rejected and returned.

Each party alleges that the other party breached the contract and seeks damages.  United Galvanizing claims that the zinc it received did not conform to what it ordered and that it properly rejected the nonconforming material.  United Galvanizing seeks to recover the expenses it incurred as a result of the nonconforming zinc, including testing the zinc and the contents of its kettle and replacing chemicals needed to restore the proper  balance to the kettle.  United Galvanizing has submitted invoices documenting those costs.   (Pl.'s Exs. 12A–12F.)  This court previously ruled that consequential damages were not recoverable.  (Docket Entry No. 59).

Richker Metals asserts that the zinc it supplied conformed to what Henrichsen ordered and that United Galvanizing breached the contractual obligation to pay for the zinc that it used. Alternatively, Richker Metals asserts that under the UCC, even if the zinc was nonconforming, United Galvanizing accepted it by using it and is obligated to pay the contractual amount, $34,912.49.  (Def.'s Ex. 7.)  Both sides seek attorneys' fees.

**IV.     Applying the Legal Standards**

### A.    The Applicable Law

Texas law applies.  Texas has adopted Article 2 of the Uniform Commercial Code (UCC), TEX. BUS. & COM CODE. § 2.101, *et seq.*  The UCC supersedes the common law.  To the extent the UCC does not resolve a question, courts generally look to the common law.  *Id.* § 1.303(b); *Davidson v. FDIC*, 44 F.3d 246, 253 n.7 (5th Cir. 1995).  The UCC provides the law governing the obligations of buyers and sellers of goods.  *See Med. City Dallas, Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 59 (Tex. 2008).  Because a purpose of the UCC is "to make uniform the law among the various jurisdictions" adopting it, TEX. BUS. & COM. CODE § 1.103(a), decisions from other jurisdictions that have adopted the UCC are persuasive.  *See MBank El Paso, N.A. v. Sanchez*, 836 S.W.2d 151, 152–53 (Tex. 1992) (following decisions from other jurisdictions decisions in a case governed by the UCC).  The parties in this case are both merchants under the UCC because they both regularly deal with zinc, the good involved in this case.  TEX. BUS. & COM. CODE § 2.104(a); *Crest Ridge Const. Grp., Inc. v. Newcourt Inc.*, 78 F.3d 146, 150 (5th Cir. 1996).

"In Texas, '[t]he essential elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach.'"  *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009) (quoting *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex.App.—Houston [14th Dist.] 2005, pet. denied)).

United Galvanizing also seeks recovery under the TDTPA.  The TDTPA allows recovery for breach of warranty and for misrepresentation.  TEX. BUS. & COM. CODE §§ 17.46(5), 17.50(a) (1)–(2).  The TDTPA allows for attorneys' fees and, when "the trier of fact finds that the conduct of the defendant was committed knowingly, . . . the trier of fact may award not more than

16

three times the of damages for . . . economic damages." *Id.* § 17.50(b).

Under the UCC, breach of contract and breach of warranty claims are not the same causes of action. *Sw. Bell Tel. Co. v. FDP Corp.*, 811 S.W.2d 572, 576 (Tex. 1991). Generally, a breach of contract occurs when a seller fails to deliver as promised. *Chilton Ins. Co. v. Pate & Pate Enters.*, 930 S.W.2d 877, 890 (Tex. App.—San Antonio 1996, writ denied). A breach of warranty occurs when the seller delivers nonconforming or defective goods. *Id.* The "critical factor" in determining whether a buyer has a breach of contract or a breach of warranty claim "is whether the buyer has finally accepted the goods." *Selectouch Corp. v. Perfect Starch, Inc.*, 111 S.W.3d 830, 834 (Tex. App.—Dallas 2003, no pet.). Once a buyer accepts the goods and can no longer revoke that acceptance, he is limited to recovering under § 2.714 of the UCC for breach of warranty if the goods are defective or nonconforming. *Id.*; *see also Toshiba Mach. Co., Am. v. SPM Flow Control, Inc.*, 180 S.W.3d 761, 771 (Tex. App.—Fort Worth [2nd Dist.] 2005, pet. granted, judgm't vacated w.r.m.) ("A buyer's rejection or acceptance of nonconforming [or defective] goods determines the remedies available to him."); *Trident Steel Corp. v. The Wiser Oil Co.*, 223 S.W.3d 520, 526 (Tex.App.—Amarillo [7th Dist.] 2006, pet. denied) ("[I]t is the buyer's acceptance or rejection of goods [that] determines the remedies available to the buyer, not the seller's mere delivery of something.").

### B.    The Parties' Contract

#### 1.    UCC 2-201: The Statute of Frauds

Section 2-201 of the UCC, the statute of frauds provision, states that "a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and

signed by the party against whom enforcement is sought . . . ." TEX. BUS. & COM. CODE § 2.201(a);

*Axelson, Inc. v. McEvoy-Willias, a Div. of Smith Int'l (North Sea), Ltd.*, 7 F.3d 1230, 1233 n.6 (5th

Cir. 1993) (summary calendar) (holding that writings that "may not form a contract themselves"

satisfied § 2.201(a) because "[t]he statute only requires (1) "some writing sufficient to indicate that

a contract for sale has been made," (2) a signature (in a loose sense), and (3) a quantity term"

(internal quotations omitted)); *see also Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 295 (5th Cir.

2002) ("The UCC does not require that the contract itself be in writing, only that there be adequate

documentary evidence of its existence and essential terms . . . ."). The writing must specify the

quantity but need not specify "the general quality of the goods." TEX. BUS. & COM. CODE

§ 2-201(a) & cmt. 1; *Int'l Metal Sales, Inc. v. Global Steel Corp.*, No. 03-07-00174-CV, 2010 WL

1140218, at *9 (Tex. App.—Austin Mar. 24, 2010); *Pac. Prods., Inc. v. Great W. Plywood, Ltd.*, 528

S.W.2d 286, 293 (Tex. App.—Fort Worth 1975). "All that is required is that the writing afford a

basis for believing that the offered oral evidence rests on a real transaction." TEX. BUS. & COM.

CODE § 2.201 cmt. 1; *Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc.*, 55 F.3d 181, 187 (5th Cir.

1995).

 An exchange of e-mails between contracting parties may satisfy the UCC statute of frauds.

*See Cloud Corp.*, 314 F.3d at 296 (holding that an e-mail satisfied the UCC's statute of frauds

because neither the UCC's words nor purpose require a handwritten signature); *Copeland Corp. v.

Choice Fabricators Inc.*, 345 F.App'x 74, 76–77 (6th Cir. 2009) (Ohio's enactment of the UCC);

*Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 378 F. Supp. 2d 377, 383–88 (S.D. N.Y. 2005) (New

York's enactment of the UCC).

 After Henrichsen and Vasquez had their lunch meeting, Henrichsen sent an e-mail to

Vasquez requesting "a load of the zinc metal we discussed at lunch the other day."  Pl.'s Ex. 2.

Vasquez responded, "I will call am tomorrow and get a ship date for you.  Thank you for the

business."  Def.'s Ex. 1.  These e-mails state a quantity of goods — a load of zinc — and allow the

court to infer that an agreement has been reached.  The UCC's statute of frauds does not prevent

enforcement of the contract.[2]

Even if the contract did not conform to § 2.201(a), it is enforceable under § 2.201(c)(3),

which states:

> (c) A contract which does not satisfy the requirements of Subsection (a) but
> which is valid in other respects is enforceable.  . . .
>
> (3) with respect to goods . . . which have been
> received and accepted (Section 2.606).

TEX. BUS. & COM. CODE § 2.201(c)(3).

Acceptance of goods received under § 2.606(a) occurs when the buyer:

> (1) after a reasonable opportunity to inspect the goods signifies to the
> seller that the goods are conforming or that he will take or retain
> them in spite of their non-conformity; or
>
> (2) fails to make an effective rejection (Subsection (a) of Section
> 2.602), but such acceptance does not occur until the buyer has had a
> reasonable opportunity to inspect them; or
>
> (3) does any act inconsistent with the seller's ownership . . . .

---

[2]  As between merchants, a written confirmation of an order provides a basis to enforce a contract that does not comply
with § 2.201(a).  Section 2.201(b) of the UCC provides:

> Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient
> against the sender is received and the party receiving it has reason to know its contents, it satisfies the
> requirements of Subsection (a) against such party unless written notice of objection to its contents is
> given within ten days after it is received.

TEX. BUS. & COM. CODE § 2.201(b).  United Galvanizing denied receiving the written confirmation of the order that
Richker Metals sent.  Because the undisputed evidence satisfies subsections (a) and (c), it is unnecessary to resolve this
factual dispute.

*Id.* § 2.606.

This court finds and concludes that United Galvanizing received conforming goods.  This court also finds and concludes that United Galvanizing's use of half the zinc received was an acceptance of that zinc because it was an act inconsistent with the seller's ownership.  United Galvanizing failed to make an effective rejection after a reasonable opportunity to inspect the zinc.

When the zinc arrived at United Galvanizing, and before half the load was placed in the kettle, no one at United Galvanizing made any inquiry of Richker Metals about the chemical composition of the zinc, despite the fact that Henrichsen had — for the first time — ordered remelt zinc and despite the presence of clear warnings that the zinc did not meet the requirements of ASTM B 6.  Using the half-load, despite an opportunity to inspect, accepted that portion of the zinc.   4 LARY LAWRENCE, ANDERSON ON THE UNIFORM COMMERCIAL CODE § 2-606.70, at 272 (3d ed. 2006) ("Once the buyer has used the goods, the buyer cannot claim that he or she did not accept the goods.") (citing cases); *id.* at 273 ("When the buyer puts the goods to use, it is generally held that he has accepted the goods.") (citing cases).

### 2.    The Terms of the Contract

United Galvanizing ordered, via e-mail, "the zinc metal we discussed at lunch the other day.  I would like to give a load a try?"  No grade was specified in the e-mail.   Pl.'s Ex. 2.  It is undisputed that United Galvanizing ordered 45,000 pounds of remelt zinc at $1.5759 per pound.  This court finds that United Galvanizing did not order remelt zinc that met or exceeded any of the ASTM B 6 categories.  At the lunch meeting between Henrichsen and Vasquez, they discussed the availability of remelt zinc with average aluminum concentrations of .02 to .03 percent.  This exceeded the aluminum levels ASTM B 6 grade with the highest aluminum content, Prime Western.

Vasquez did not offer, and Henrichsen did not order, remelt zinc that met or exceeded Prime Western grade under ASTM B 6.

 The remelt zinc that Richker Metals ordered from Imperial Zinc conformed to what United Galvanizing ordered from Richker Metals.  There is no evidence that what Imperial Zinc delivered was different from what Richker Metals ordered.  Dr. Langill credibly testified that the erratic range of aluminum levels in the different samples taken from the zinc were consistent with zinc refined by remelting.  No evidence contradicted this assessment.

Because Richker Metals delivered zinc that conformed to the contract, United Galvanizing must pay for the zinc that it accepted and used.  *See* Tex. Bus. & Com. Code §§ 2.703(1) (Where the buyer . . . fails to make a payment due on . . . delivery . . . the aggrieved seller may . . . recover . . . in a proper case the price . . . .”), 2.709(a)(1) (“When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under the next section, the price . . . of goods accepted or of conforming goods lost or damaged within a commercially reasonable time after risk of their loss has passed to the buyer”).  As explained above, United Galvanizing’s use of the zinc constitutes acceptance of that zinc.

United Galvanizing could not rightfully revoke its acceptance because the goods conformed to what United Galvanizing had contracted to receive, and because United Galvanizing did not attempt a revocation until after there was a substantial change in the condition of the goods — use in United Galvanizing’s kettle — that was not caused by any defect in the goods.  *See id.* § 2.608(b).  Because United Galvanizing accepted the half-load that it used, it is obligated to pay the price it contracted to pay under Tex. Bus. & Com. Code §§ 2.607(a) and 2.709(a)(1).  Because Richker Metals delivered zinc that conformed to the contract, United Galvanizing must pay for the zinc.  *See*

*id.* § 2.709.

Richker Metals has only sought payment for the portion that United Galvanizing used.  It submitted an invoice for $34,912.49.  United Galvanizing does not dispute that the invoice is an appropriate calculation of the price of the zinc.  Richker Metals has requested no further damages, other than attorneys' fees.  Richker Metals is entitled to recover $34,912.49 from United Galvanizing, as well as reasonable attorney's fees.

## III.  Conclusions of Law

This court enters the following conclusions of law:

• Richker Metals agreed to sell, and United Galvanizing agreed to purchase, remelt zinc. Richker Metals did not offer, and United Galvanizing did not agree to purchase, remelt zinc that met or exceeded Prime Western grade.

• Richker Metals did not misrepresent the chemical composition, quality, or grade of the zinc it offered and delivered to United Galvanizing.

• Richker Metals ordered, and Imperial Zinc delivered, remelt zinc that conformed to what United Galvanizing had agreed to purchase.

• United Galvanizing accepted one-half of the zinc that was delivered and neither rejected it nor revoked its acceptance.  United Galvanizing breached its contractual obligation to Richker Metals by failing to pay for the zinc it used in its galvanizing bath.

• Richker Metals is entitled to recover the contract amount of $34.912.49, plus reasonable attorney's fees.

• United Galvanizing is not entitled to recover the expenses or damages incurred as a result of using the zinc delivered by Richker Metals.

A telephone conference is set for **January 13, 2011, at 4:00 p.m.** to set a schedule for resolving the outstanding attorney's fees issue.

SIGNED on January 3, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge